UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| NICOLE A.,<br><br>    Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration,<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER AFFIRMING COMMISSIONER'S DECISION**<br><br><br>Case No. 2:21-cv-00270<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Nicole A.[1] brought this action against Kilolo Kijakazi, Acting Commissioner of the Social Security Administration (the "Commissioner"), seeking judicial review of the denial of her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–434.  (*See* Compl., Doc. No. 2.)  The Administrative Law Judge ("ALJ") determined Ms. A. did not qualify as disabled.  (Certified Tr. of Admin. R. ("Tr.") 11–28, Doc. No. 15.)  Based on a careful review of the entire record and the parties' briefs,[2] the court[3] affirms the Commissioner's decision.

---

[1] Pursuant to best practices in the District of Utah addressing privacy concerns in certain cases, including Social Security cases, the court refers to Plaintiff by her first name and last initial only.

[2] This order is based on the written memoranda, as oral argument is unnecessary.  *See* DUCivR 7-1(g).

[3] The parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (Doc. No. 10.)

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code provides for judicial review of a final decision of the Commissioner.  This court reviews the ALJ's decision to determine whether substantial evidence supports the factual findings and whether the ALJ applied the correct legal standards.  42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  "[F]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principals have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).

An ALJ's factual findings are "conclusive if supported by substantial evidence." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153, ___ U.S. ___ (2019) (internal quotation marks omitted).  Although the evidentiary sufficiency threshold for substantial evidence is "not high," it is "more than a mere scintilla." *Id.* at 1154 (internal quotation marks omitted).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (internal quotation marks omitted).  And the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).

## APPLICABLE LAW

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  An individual is considered

disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In making a disability determination, the ALJ employs a five-step sequential evaluation, considering whether:

1)  the claimant is engaged in substantial gainful activity;

2)  the claimant has a severe medically determinable physical or mental impairment or combination of impairments;

3)  the impairment or combination of impairments is equivalent to an impairment, which precludes substantial gainful activity, listed in the appendix of the relevant disability regulation;

4)  the claimant has a residual functional capacity to perform past, relevant work; and

5)  the claimant has a residual functional capacity to perform other work in the national economy considering his/her/their age, education, and work experience.

*See* 20 C.F.R. § 404.1520(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750–51 (10th Cir. 1988).  The claimant has the burden of establishing disability in the first four steps.  *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).  At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy.  *Id.*

PROCEDURAL HISTORY

Ms. A. applied for Title II disability benefits on May 31, 2018, alleging disability beginning on September 1, 2014.  (Tr. 106–07.)  The ALJ found Ms. A. last met the insured

status requirements of the Social Security Act on December 31, 2018. (*Id.* at 13.) After a hearing, the ALJ issued a decision on August 14, 2020, finding Ms. A. was not disabled during the period from her alleged onset date to her last insured date. (*Id.* at 11–28.)

At step two of the sequential evaluation, the ALJ found Ms. A. had the severe impairments of fibromyalgia, asthma, obesity, obstructive sleep apnea, bipolar disorder, anxiety, agoraphobia with panic disorder, and posttraumatic stress disorder. (*Id.* at 14.) The ALJ found Ms. A. had nonsevere impairments related to thyroid function and gestational diabetes mellitus. (*Id.* at 14–15.) At step three, the ALJ found Ms. A.'s impairments did not meet or equal the severity of a listed impairment. (*Id.* at 15–18.) At step four, the ALJ determined Ms. A. had the residual functional capacity to perform sedentary work with the following restrictions:

> [S]he was able to lift and/or carry objects weighing 10 pounds during an 8-hour workday; stand and/or walk for 2 hours; sit for 6 hours; she was able to perform postural activities up to 1/3 of 8-hour workday; she could be exposed to breathing irritants up to 2/3 of 8-hour workday. Mentally, she was able to perform simple, routine, repetitive tasks in a low stress work environment—i.e.[,] low volume, low production level type work which required interaction with the public, supervisors and coworkers up to 1/3 of 8-hour workday.

(*Id.* at 18.) Based on this residual functional capacity, the ALJ found Ms. A. was unable to perform any past relevant work. (*Id.* at 26–27.) But the ALJ determined Ms. A. was not disabled because, at step five, he found Ms. A. capable of performing other jobs existing in significant numbers in the national economy. (*Id.* at 27–28.) The Appeals Council denied Ms. A.'s request for review, (*id.* at 1), making the ALJ's decision final for purposes of judicial review.

## DISCUSSION

Ms. A. argues the ALJ erred by (1) failing to properly evaluate the medical opinions of Ms. A.'s treating physician, Dr. Debra Shinkle; (2) failing to properly consider Ms. A.'s alleged

symptoms; and (3) determining Ms. A.'s residual functional capacity ("RFC") without crediting

any medical opinions, and improperly relying on her parttime work history and activities of daily

living.  (Opening Br. 8–25, Doc. No. 18.)  Ms. A. contends, as a result of these errors, the ALJ's

RFC findings are unsupported by substantial evidence.  (*Id.*)

## 1. **Evaluation of Dr. Shinkle's Medical Opinions**

The Social Security Administration implemented new regulations for evaluating medical

evidence for claims, like Ms. A.'s, filed after March 27, 2017.  *See Revisions to Rules Regarding*

*the Evaluation of Med. Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected

by 82 Fed. Reg. 15132 (Mar. 27, 2017)); 20 C.F.R. § 404.1520c.  Under these regulations, the

ALJ does not "defer or give any specific evidentiary weight, including controlling weight," to

any medical opinions.  20 C.F.R. § 404.1520c(a).  Instead, the ALJ assesses the persuasiveness

of medical opinions and prior administrative medical findings by evaluating the following

factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization,

and (5) other factors.  *Id.* § 404.1520c(b), (c).  Supportability and consistency are the most

important factors the ALJ must consider—and the ALJ is required to explain how she considered

these two factors.  *See id.* § 404.1520c(b)(2).  For supportability, the ALJ examines how well

medical sources support their own opinions with "objective medical evidence" and "supporting

explanations."  *Id.* § 404.1520c(c)(1).  For consistency, the ALJ considers whether the medical

opinion is consistent with evidence from other medical and nonmedical sources in the record.  *Id.*

§ 404.1520c(c)(2).

While an ALJ need not discuss every piece of evidence, "[t]he record must demonstrate

that the ALJ considered all of the evidence."  *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th

Cir. 1996).  "[I]n addition to discussing the evidence supporting [her] decision, the ALJ also

must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Id.* at 1010.

Dr. Shinkle was Ms. A.'s primary care provider from September 2017 to December 2018. (*See* Tr. 682, 686–91, 711–12, 869–72.) In September 2018, Dr. Shinkle completed a mental capacity assessment and a physical assessment on check-box forms. (*Id.* at 810–14.) Dr. Shinkle listed Ms. A.'s diagnoses as fibromyalgia, anxiety, and depression. (Tr. 810, 813.)

On the mental capacity assessment, under the category for "concentration, persistence, or maintaining pace," Dr. Shinkle opined that Ms. A. had extreme limitations in her ability to sustain an ordinary routine and regular attendance at work and her ability to work a full day without needing more than the allotted number or length of rest periods. (*Id.* at 811.) She opined Ms. A. had marked limitations in her ability to work at an appropriate and consistent pace or to complete tasks in a timely manner. (*Id.*) She also opined Ms. A. was capable of managing benefits in her own best interest. (*Id.* at 812.)

On the physical assessment, Dr. Shinkle opined Ms. A.'s impairments would "constantly" interfere with the attention and concentration required to perform simple work-related tasks. (*Id.* at 813.) She also stated Ms. A. would need to take extra breaks to recline or lie down; would require unscheduled thirty-minute breaks daily; and would be absent from work more than four times a month as a result of her impairments. (*Id.* at 813–14.) She opined Ms. A. could walk one city block without rest or significant pain. (*Id.* at 813.) She opined Ms. A. could sit for only one hour and stand/walk for only one hour during an eight-hour workday. (*Id.* at 813.) She opined Ms. A. could lift and carry less than ten pounds frequently and twenty pounds occasionally but could never lift or carry fifty pounds. (*Id.*)

The ALJ found Dr. Shinkle's opinion that Ms. A. was capable of managing her own funds persuasive, referring to treatment notes showing consistently normal mental status examinations.  (*Id.* at 25 (citing *id.* at 682, 710).)  But he found the rest of Dr. Shinkle's mental capacity assessment unpersuasive.  (*Id.*)  He found Dr. Shinkle's opinion that Ms. A. had extreme limitations in concentrating, persisting, and maintaining pace was unsupported by Dr. Shinkle's treatment notes.  (*Id.*)  He also found this opinion was "not supported by her conservative treatment of [Ms. A.], which only consisted of medication management."  (*Id.*)  And he found Dr. Shinkle's opinion "inconsistent with objectively normal psychiatric findings from [Ms. A.'s] other providers."  (*Id.* (citing *id.* at 450).)

The ALJ found the physical assessment was also "largely unpersuasive."  (*Id.*)  The ALJ noted this assessment, like the mental capacity assessment, was "not supported by a detailed explanation of the conclusions arrived at; rather[,] it is supported by limitations noted on a check-off form, with minimal if any accompanying explanation."  (*Id.* at 25–26.)  The ALJ found Dr. Shinkle's opinion that Ms. A.'s impairments would constantly interfere with attention and concentration was "inconsistent with examinations at Granger Pain & Spine where [Ms. A.] had no difficulty with concentration or memory."  (*Id.* at 26 (citing *id.* at 825).)  The ALJ found Dr. Shinkle's opinions regarding Ms. A.'s need for breaks, her ability to sit, stand, and walk, and her ability to lift and carry were "inconsistent with evaluations at GPS for pain management where [Ms. A.] had normal strength, sensation, reflexes, coordination, and range of motion and was able to ambulate and change positions without difficulty."  (*Id.* (citing *id.* at 824–25, 830).)

The ALJ properly evaluated Dr. Shinkle's opinions.  First, the ALJ used the correct legal framework.  The ALJ assessed the supportability and consistency of Dr. Shinkle's opinions and explained how he considered these factors, as required under the regulations.  *See* 20 C.F.R.

§ 404.1520c(b), (c).  Further, the ALJ's assessment is supported by substantial evidence.  As the ALJ noted, Dr. Shinkle provided no explanation to support her opinions on the forms themselves, apart from merely listing Ms. A.'s diagnoses.  In fact, the area on the mental capacity form inviting such explanation was left blank.  (Tr. 812.)  The ALJ's findings are also supported by the medical records he cited, including treatment records from Dr. Shinkle and other providers showing normal mental status examinations, (*id.* at 450, 682, 710), and the pain specialist's examination indicating Ms. A. had no difficulty with concentration or memory and no difficulty ambulating or transitioning from sitting to standing,[4] (*id.* at 825).  This evidence is adequate to support the ALJ's assessment of Dr. Shinkle's opinion.  Because the ALJ applied the correct legal framework, he explained how he considered supportability and consistency, and his assessment was supported by substantial evidence, the ALJ did not err in his evaluation of Dr. Shinkle's opinion.

Ms. A. argues the ALJ's evaluation of Dr. Shinkle's opinion was "clouded" by a lack of understanding of the nature of fibromyalgia.  (Opening Br. 11, 17, Doc. No. 18.)  Ms. A. notes fibromyalgia is diagnosed through a patient's reported symptoms rather than objective testing, and she argues the longitudinal medical record must be considered because symptoms wax and wane.  (*Id.* at 11.)  She contends Dr. Shinkle "understood [Ms. A.'s] impairment and based her opinion on her longitudinal medical relationship." (*Id.* at 17.)

The record does not support Ms. A.'s argument that the ALJ misunderstood the nature of her fibromyalgia or failed to properly consider this condition in assessing Dr. Shinkle's opinions.

---

[4] As Ms. A. notes, the ALJ cited two "evaluations," but these appear to be duplicate records of a single examination.  (*See* Tr. 824–25, 830; *see also* Opening Br. 16–17, Doc. No. 18.) Nevertheless, the records from this examination support the ALJ's findings.  A minor misstatement regarding the number of evaluations does not substantially undermine the ALJ's analysis.

As an initial matter, the ALJ credited Ms. A.'s fibromyalgia diagnosis, finding it to be a severe impairment supported by the medical record.  (*Id.* at 14, 25.)  The ALJ also discussed Ms. A.'s medical history in detail, noting evidence of fibromyalgia throughout the longitudinal record— including before Ms. A. received a formal diagnosis.  (*Id.* at 20–25.)  Finally, the ALJ noted Dr. Shinkle personally examined Ms. A. and cited records throughout her treatment of Ms. A.  (*Id.* at 25–26.)  Thus, the ALJ evaluated Dr. Shinkle's opinions in light of her longitudinal treatment of Ms. A.

Ms. A. next challenges the ALJ's finding that Dr. Shinkle's opinions were not supported by her treatment notes.  (Opening Br. 12, Doc. No. 18.)  With respect to the mental capacity assessment, Ms. A. points to records from Dr. Shinkle indicating:

- Ms. A. was "stretching and moving all the time" and tearful during an appointment, (*id.* at 690);

- Ms. A. reported being overwhelmed by all of her doctor appointments and missed an appointment because she forgot about it, (*id.* at 688, 690);

- Ms. A.'s questionnaire scores indicated severe anxiety and depression; (*id.* at 687, 871);

- Ms. A. appeared "very anxious" and reported symptoms of anxiety and depression, (*id.* at 682, 687); and

- Ms. A. was prescribed medication for these conditions, (*id.* at 682, 691).

With respect to the physical assessment, Ms. A. points to records indicating Dr. Shinkle observed Ms. A. had generalized tenderness to touch in her shoulders and back, and puffiness and tenderness in the joints in her hands, consistent with fibromyalgia, (*id.* at 712); Ms. A. reported

an eight-out-of-ten pain level which was noted as poorly controlled, (*id.* at 689); and Dr. Shinkle referred her for non-medication management of pain, (*id.* at 870).

The records Ms. A. identifies do not directly correlate to or explain the specific functional limitations opined by Dr. Shinkle. The ALJ did not err in finding these specific limitations were unsupported by the treatment notes. Even assuming this evidence could be interpreted as supportive of Dr. Shinkle's opinions, Ms. A.'s argument merely invites reweighing of the evidence, which the court cannot do. *See Langley*, 373 F.3d at 1118. As discussed above, the ALJ pointed to normal mental status examinations and the lack of supporting explanations in finding Dr. Shinkle's opinion unsupported. Where substantial evidence supports the ALJ's assessment of Dr. Shinkle's opinion, the court may not substitute its judgment for that of the ALJ—even if some evidence could support a different conclusion. *See id.*

Ms. A. also challenges the ALJ's finding that Dr. Shinkle's opinions were inconsistent with other providers' records. (Opening Br. 13–15, Doc. No. 18.) Ms. A. points out other providers noted "abnormal mental symptoms" such as anxiety, panic attacks, fatigue, and depression—which Ms. A. contends are consistent with Dr. Shinkle's opinion. (*See* Tr. 405, 409, 499, 555, 681, 700, 704, 825, 830.) With respect to physical limitations, Ms. A. points to treatment records indicating two other doctors observed tenderness and joint swelling, (*id.* 399, 401, 835); she consistently reported pain, muscle aches, and fatigue, (*id.* at 372, 404, 449, 702, 707–08, 722, 823, 828, 838); and another doctor diagnosed fibromyalgia, (*id.* at 395). Ms. A. also argues the ALJ placed undue weight on a single examination from the pain specialist and, instead, should have relied on records from providers with a longitudinal treatment relationship. (*See* Opening Br. 16–17, Doc. No. 18.) Again, these arguments merely invite reweighing of the evidence. The ALJ relied on substantial evidence in the record which was inconsistent with Dr.

Shinkle's opinions, and the court may not substitute its judgment for the ALJ's, despite some

evidence supporting a different conclusion.  *See Langley*, 373 F.3d at 1118.

For all these reasons, the ALJ did not err in his evaluation of Dr. Shinkle's medical

opinions.

## 2.  Evaluation of Subjective Symptoms

Ms. A. next argues the ALJ failed to properly consider her alleged symptoms and

limitations.  (Opening Br. 20–25, Doc. No. 18.)

Evaluation of a claimant's symptoms follows a two-step process.  First, the ALJ "must

consider whether there is an underlying medically determinable physical or mental

impairment(s) that could reasonably be expected to produce an individual's symptoms, such as

pain."  Soc. Sec. Ruling ("SSR") 16-3p, 2016 SSR LEXIS 4, at *3; *see also* 20 C.F.R.

§ 404.1529(b).  Second, the ALJ must "evaluate the intensity and persistence of those symptoms

to determine the extent to which the symptoms limit an individual's ability to perform work-

related activities."  SSR 16-3p, 2016 SSR LEXIS 4, at *4; *see also* 20 C.F.R. § 404.1529(c).  In

doing so, the ALJ must "examine the entire case record, including the objective medical

evidence; an individual's statements about the intensity, persistence, and limiting effects of

symptoms; statements and other information provided by medical sources and other persons; and

any other relevant evidence in the individual's case record."  SSR 16-3p, 2016 SSR LEXIS 4, at

*10.  Factors relevant to this analysis include the claimant's daily activities; the location,

duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type

dosage, effectiveness, and side effects of any pain medications; non-medication treatment for

pain; and any other measures used to relieve pain.  20 C.F.R. § 404.1529(c)(3).  The ALJ must

also consider "whether there are any inconsistencies in the evidence and the extent to which

there are any conflicts between [the claimant's] statements and the rest of the evidence, including

[the claimant's] history, the signs and laboratory findings, and statements by . . . medical sources

or other persons." 20 C.F.R. § 404.1529(c)(4).

Ms. A. claimed her impairments affected her ability to lift, bend, stand, walk, sit, kneel,

climb stairs, talk, see, and use her hands. (*See* Tr. 19, 297.) She also alleged her impairments

caused difficulty with memory and with completing tasks, concentrating, understanding,

following instructions, and getting along with others. (*See id.*) At the hearing, Ms. A. testified

she had chronic fatigue and pain, which was "unbearable." (*See id.* at 19, 98.) She testified

physical activity caused fatigue which required her to rest, and she lay down four hours of an

eight-hour day. (*See id.* at 19, 87.) She testified she was able to assist with household chores

and cooking, but they were painful and tiring. (*See id.* at 19, 90.) She testified her depression,

anxiety, and bipolar disorder also caused issues, including difficulty getting along with others at

her part-time job and problems focusing, handling stress, and completing tasks. (*See id.* at 19,

93–96.)

After summarizing this testimony, the ALJ found Ms. A.'s medically determinable

impairments could reasonably be expected to cause the alleged symptoms. (*Id.* at 20.) But the

ALJ found Ms. A.'s "statements concerning the intensity, persistence and limiting effects of

these symptoms [were] not entirely consistent with the medical evidence and other evidence in

the record." (*Id.*) The ALJ provided a detailed explanation for this finding, discussing Ms. A.'s

medical records, treatment history, work history, and the medical opinion evidence. (*Id.* at 20–

26.) Ultimately, the ALJ concluded "the medical record support[ed] some of [Ms. A.'s]

allegations but it [did] not support the degree of limitations claimed." (*Id.* at 25.) The ALJ

found the record as a whole did not support a more restrictive RFC than the one described in his decision.  (*Id.* at 25.)

Ms. A. challenges numerous aspects of the ALJ's analysis.  For the reasons explained below, Ms. A. fails to show the ALJ erred in his assessment of her symptoms and limitations.

    *a.   Objective Medical Evidence and Fibromyalgia*

First, Ms. A. challenges the ALJ's reliance on objective medical evidence such as diagnostic testing.  (Opening Br. 21–22, Doc. No. 18.)  The ALJ stated "[d]iagnostic testing ha[d] revealed impairments that would reasonably result in some limitations but not to the extent alleged."  (Tr. 24.)  Ms. A. argues diagnostic testing is of "marginal importance" for a person with fibromyalgia because the symptoms are entirely subjective and there are no laboratory tests to identify its presence or severity.  (Opening Br. 21–22, Doc. No. 18.)  Ms. A. contends this was an inappropriate reason to discredit Ms. A.'s subjective allegations.  (*Id.* at 22.)

The Tenth Circuit has rejected the notion that an ALJ may not consider objective medical evidence in assessing the limitations of a person with fibromyalgia.  *See Trujillo v. Comm'r, Soc. Sec. Admin.*, 818 F. App'x 835, 844 (10th Cir. 2020) (unpublished) (rejecting the claimant's "perfunctory assertion that it was 'improper' for the ALJ to rely on objective medical evidence in the longitudinal record" where the claimant was diagnosed with fibromyalgia); *Tarpley v. Colvin*, 601 F. App'x 641, 643 (10th Cir. 2015) (unpublished) ("[A]lthough the existence or severity of fibromyalgia may not be determinable by objective medical tests, this court has suggested that the physical limitations imposed by the condition's symptoms can be objectively analyzed.").  In *Tarpley*, the court found the ALJ properly considered examination records indicating the claimant "enjoy[ed] a full range of motion in her joints, possesse[d] normal

strength, and walk[ed] and move[d] without much difficulty" in assessing the limitations of a claimant with fibromyalgia.  601 F. App'x at 643.

Thus, the ALJ did not err, as a matter of law, by considering diagnostic testing and other objective medical evidence is assessing Ms. A.'s alleged symptoms.  Here, as in *Tarpey*, the ALJ relied on examination records from a pain clinic indicating Ms. A. had normal strength, sensation, reflexes, coordination, and range of motion, and was able to ambulate and change positions without difficulty.  (Tr. 24 (citing *id.* at 824–25, 830).)  Where the Tenth Circuit has approved consideration of this type of evidence for a claimant with fibromyalgia, the ALJ did not err in relying on it.  Moreover, the ALJ offered other reasons for his assessment of Ms. A.'s physical limitations, including Ms. A.'s work history during the relevant time period.  (*Id.* at 24–26 (noting Ms. A. worked full eight-hour shifts at a fitness center on weekends and lifted and carried fifty-pound weights).)

Ms. A. relies on *Moore v. Barnhart*, in which the Tenth Circuit held an ALJ erred by requiring a claimant's diagnosis of fibromyalgia to be established by a "formalistic clinical or laboratory test."  114 F. App'x 983, 990–92 (10th Cir. 2004) (unpublished).  But here, the ALJ credited Ms. A.'s fibromyalgia diagnosis and found it was supported by objective medical evidence in the record.  (Tr. 25 (rejecting the agency consultants' opinions that Ms. A. did not have a severe physical impairment because "objective testing show[ed] tenderness to palpitation in the . . . shoulder and back areas consistent with fibromyalgia").)  And, as noted, the ALJ did not rely solely on objective medical evidence (or the lack thereof) in assessing Ms. A.'s alleged symptoms.

For these reasons, the ALJ did not err in considering diagnostic testing and objective medical evidence in his analysis.

*b. Statements Regarding Reducing Pain Medication*

Next, Ms. A. appears to challenge the ALJ's mention of the fact that, on several occasions, Ms. A. told her doctors she wanted to reduce or stop taking pain medication. (Opening Br. 22, Doc. No. 18.)  Ms. A. does not dispute the accuracy of the ALJ's description of her statements, but merely argues she had good reasons for these requests.  (*Id.*)  Specifically, Ms. A. notes she testified she distrusted pain medication due to her history of alcoholism, and she tried to reduce medications at her doctors' recommendation when she was pregnant or trying to get pregnant.  (*Id.*)

The ALJ accurately described Ms. A.'s statements regarding reducing or stopping pain medication in his summary of her treatment history.  (Tr. 21, 678, 689, 872.)  And he expressly recognized that, on several of these occasions, she did so because she was trying to get pregnant. (*Id.* at 21.)  The ALJ made no other mention of this evidence in his decision.  Ms. A. fails to make any colorable argument as to why the ALJ's accurate summary of these records was improper.  The ALJ did not err in mentioning Ms. A.'s statements about reducing or stopping pain medication.

*c. Exercise*

Ms. A. also challenges the ALJ's mention of the fact that she exercised and stretched regularly, that she was encouraged to walk regularly, and that she was referred to aquatic therapy.  (Opening Br. 22–23, Doc. No. 18.)  But again, these statements appear only in the ALJ's summary of Ms. A.'s medical history and accurately describe the underlying records.  (Tr. 21, 689, 826.)  Ms. A. has identified no error in the ALJ's discussion of these records.

### d. Noncompliance with CPAP

Ms. A. next challenges the ALJ's discussion of her noncompliance with her CPAP. (Opening Br. 23–24, Doc. No. 18.) The ALJ noted Ms. A. complained of "insomnia, fatigue, hypersomnia, snoring, restless legs[,] and night sweats." (Tr. 21.) Testing showed severe sleep apnea, and CPAP use was recommended. (*Id.*) The ALJ found "[t]reatment records indicated that with proper compliance the claimant's multiple symptoms could resolve." (*Id.*) But the ALJ noted Ms. A. was noncompliant with CPAP use because she was claustrophobic and struggled to sleep with it on. (*Id.*)

Ms. A. argues she still could have suffered from fatigue regardless of her noncompliance because fatigue is a symptom of fibromyalgia. (Opening Br. 23, Doc. No. 18.) And she argues the record indicates she was "unable," not "unwilling," to comply due to her claustrophobia. (*Id.* at 23–24.)

Ms. A. fails to demonstrate any error in the ALJ's consideration of this issue. Failure to follow prescribed treatment is a factor which may be considered in assessing the intensity and persistence of a claimant's alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *23. While possible reasons for noncompliance must be considered, *id.*, the ALJ did so here; he specifically acknowledged Ms. A.'s claustrophobia and difficulty sleeping with the CPAP. (Tr. 21.) And the ALJ discussed Ms. A.'s allegations of fatigue throughout the medical record—not only in his discussion of her sleep apnea. (*See id.* at 19–20, 24–25.) The record demonstrates the ALJ properly considered Ms. A.'s noncompliance with CPAP, as well as her overall allegations of fatigue.

e. *Type and Frequency of Medical Treatment*

Ms. A. challenges the ALJ's finding that the type and frequency of her medical treatment was inconsistent with her allegations.  (Opening Br. 24–25, Doc. No. 18.)  In discussing Ms. A.'s mental functioning, the ALJ found Ms. A. "had not received the type nor frequency of medical treatment one would expect for an individual experiencing allegedly disabling symptoms."  (*Id.* at 22.)  The ALJ noted "[h]er treatment ha[d] been almost exclusively through her primary care providers with no evidence of mental health counseling until April 2019."  (*Id.*)  The ALJ also observed a gap in mental health treatment between November 2014 and September 2015 and stated there were "minimal if any mental health complaints until July 2016."  (*Id.*)  The ALJ found "these significant gaps in the claimant's mental health treatment suggest[] her symptoms may not have been as serious as has been alleged."  (*Id.*)

Ms. A. argues the ALJ failed to acknowledge certain evidence of mental health treatment she sought and received, including: a record showing she requested a psychology referral in June 2018, (*id.* at 685); a record of a counseling session later the same month, (*id.* at 681); a November 2014 note in her medical record indicating she was seeing a therapist, (*id.* at 410–11); her testimony that she had "seen a therapist off and on," (*id.* at 93).  Ms. A. also suggests the gap in treatment after November 2014 was due to a lapse in insurance.  (Opening Br. 25, Doc. No. 18.)

The type and frequency and medical treatment sought is a relevant factor in evaluating a claimant's alleged symptoms.  SSR 16-3p, 2016 SSR LEXIS 4, at *23.  "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, . . .  [the ALJ] may find the alleged intensity and persistence

of an individual's symptoms are inconsistent with the overall evidence of record." *Id.*  The ALJ

properly considered this issue in evaluating Ms. A.'s alleged symptoms and limitations.

   The ALJ's findings on this issue are also supported by the record.  The ALJ's statement

that there was no evidence of mental health counseling until April 2019 was inaccurate, given the

November 2014 note that Ms. A. was seeing a therapist and the June 2018 counseling record.

But these are only two isolated records during a relevant time period spanning more than four

years.  Because Ms. A. did not specify the time period in which she saw a therapist "on and off,"

her testimony does not directly contradict the ALJ's statement—and she provided no details

regarding the frequency of her therapy sessions.  (*See id.* at 93.)  On this record, the ALJ did not

err in finding Ms. A.'s mental health treatment was almost exclusively through primary care

providers, and that there were significant gaps in mental health treatment.  This was an accurate

characterization of the medical record, despite the ALJ's misstatement regarding the absence of

mental health counseling.  Thus, the ALJ did not err in his consideration of this issue.

   In sum, Ms. A. fails to identify any reversible error in the ALJ's analysis of her alleged

symptoms and limitations.

### 3. Other Challenges to the RFC Determination

   Finally, Ms. A. argues the ALJ's RFC determination is unsupported because he crafted it

without crediting any medical opinions and because he improperly relied on her parttime work

and activities of daily living.  (Opening Br. 18–20, Doc. No. 18.)

#### a. *Determination of RFC Without Crediting Medical Opinions*

   The only provider who offered a medical opinion regarding Ms. A.'s functional

limitations was Dr. Shinkle, and the ALJ found her opinion largely unpersuasive as discussed

above.  The ALJ also considered the prior administrative findings of four state agency medical

18

and psychological consultants, who opined Ms. A. did not have any severe medically determinable physical or mental impairments and experienced only mild mental limitations.  (Tr. 24–25.)  The ALJ found these opinions unpersuasive because they were based on incomplete records and inconsistent with Ms. A.'s longstanding diagnoses, her treatment history, and objective medical evidence of her impairments in the record.  (*Id.*)  The ALJ explained he assessed more restrictive limitations based on the "overall record, including the claimant's testimony at the hearing and additional medical evidence received at the hearing level."  (*Id.* at 25.)   Thus, the ALJ found Ms. A. was less limited than Dr. Shinkle opined but more limited than the agency consultants opined, based on his evaluation of the entire record.

The ALJ did not err in making an RFC determination without crediting the medical opinion evidence.  "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).  "[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record."  *Id.* (quoting *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004)) (alteration in original).  This is because "[t]he determination of RFC is an administrative assessment, based upon all the evidence of how the claimant's impairments and related symptoms affect her ability to perform work-related activities."  *Young v. Barnhart*, 146 F. App'x 952, 955 (10th Cir. 2005) (unpublished).  In the absence of persuasive medical opinion evidence, the ALJ properly evaluated Ms. A.'s functional limitations based on the whole record, including Ms. A.'s testimony, her work history during the relevant time period, and the medical record.  (*See* Tr. 18–26.)

### b. *Work History*

Ms. A. argues the ALJ improperly relied on her parttime work during the relevant time period in assessing her RFC.  (Opening Br. 19, Doc. No. 18.)  Ms. A. testified she worked at the front desk at a fitness center in 2015 and 2016 for approximately sixteen or eighteen hours per week.  (Tr. 81–82.)  Ms. A. testified she picked up weights at the end of the night, weighing up to fifty pounds, but she couldn't have done that for two hours in an eight-hour day.  (*Id.* at 85.)  The ALJ explained his RFC determination was supported by Ms. A.'s work history at the fitness center, noting "[a]lthough the claimant only worked on the weekends, she was able to work full eight hour shifts and even lifted and carried fifty pound weights when necessary."  (*Id.* at 24.)

The ALJ did not err in considering Ms. A.'s parttime work in determining her RFC.  Ms. A. argues her ability to work for two days per week does not reflect an ability to work fulltime.  (Opening Br. 19, Doc. No. 18.)  But the ALJ recognized this job was only parttime, it was only one factor he relied on in assessing her RFC, and the assessed RFC (sedentary work with lifting and carrying up to ten pounds) is more restrictive than the duties Ms. A. described performing at the gym.  Thus, the ALJ did not find Ms. A. was capable of performing the duties of her parttime job fulltime.  Ms. A. has demonstrated no error in the ALJ's consideration of her work history.

### c. *Activities of Daily Living*

Ms. A. argues the ALJ erred his consideration of her activities of daily living.  (Opening Br. 19–20, Doc. No. 18.)  The ALJ stated his mental RFC determination—restricting Ms. A. to simple, routine tasks in a low-stress work environment with limited social interactions—was supported, in part, by her activities of daily living.  (Tr. 24.)  The ALJ noted Ms. A. was able to plan and prepare meals, assist with household chores, make comparative purchases, and attend church and AA meetings.  (*Id.* at 16–17.)

Ms. A. contends she would not have been able to perform these activities fulltime in a competitive work environment, pointing to her testimony that she received significant help from family members, needed frequent breaks, responded poorly to stress, and had difficulty focusing and concentrating.  (Opening Br. 19–20, Doc. No. 18 (citing Tr. 90, 95–96).)  But the ALJ acknowledged and discussed this testimony in his decision, indicating he considered it.  (Tr. 16–17, 19.)  Further, the restrictions in the RFC accounted for at least some limitations in these areas.  (*Id.* at 18.)  Ms. A. has identified no error in the ALJ's consideration of her activities of daily living.

For these reasons, Ms. A. has not demonstrated the ALJ erred in his determination of her RFC.

## CONCLUSION

The Commissioner's decision is AFFIRMED.

DATED this 26th day of September, 2022.

BY THE COURT:

Daphne A. Oberg
United States Magistrate Judge